UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

JOSHUA WILEY,                          )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )        No.  1:13CV118 SNLJ
                                       )                        (TIA)
CAROLYN W. COLVIN,                     )
ACTING COMMISSIONER OF                 )
SOCIAL SECURITY,                       )
                                       )
            Defendant.                 )

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of

the Social Security Act and for Supplemental Security Income benefits under Title XVI of the

Act.  The case was referred to the undersigned for a report and recommendation pursuant to 28

U.S.C. § 636(b).

## I.  Procedural History

On December 2, 2010, Plaintiff filed applications for Disability Insurance Benefits and

for Supplemental Security Income.  (Tr. 152-66)  Plaintiff claimed that he became unable to

work on March 15, 2008 due to suicidal thoughts; homicidal thoughts; schizophrenia; insomnia;

irritability; social anxiety disorder; agoraphobia; anxiety; bi-polar; depression; and hearing

voices.  (Tr. 77, 152)  The applications were denied initially on January 6, 2011, after which

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 70-72, 77-83)

On May 24, 2012,  Plaintiff testified at a hearing before the ALJ.  (Tr. 29-66)   In a decision

dated July 12, 2012, the ALJ found that Plaintiff had not been under a disability from March 15,

2008, through the date of the decision.  (Tr. 12-22)  On June 14, 2013, the Appeals Council denied Plaintiff's request for review.  (Tr. 1-3)  Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

## II.  Subjective Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel.  Plaintiff's attorney first stated that the theory of the case was that Plaintiff's combination of impairments precluded him from employment.  These impairments included concentration problems, anxiety, paranoia, insomnia, anger outbursts, auditory and visual hallucinations, and shoulder problems.  Counsel then questioned the Plaintiff, who testified that was married and had an 11 ½ month old son. They lived in an apartment in Des Moines, Iowa.  Plaintiff was born on September 8, 1976, measured 5 feet 9 inches, and weighed 185 pounds.  Plaintiff graduated from high school and studied diesel mechanics while enlisted in the Marine Corps for four years.  (Tr. 31-35)

Plaintiff stated that he was in a constant state of anxiety over what he was going through with finances and his mental status.  He was prone to angry outbursts but tried to suppress his anger in his day-to-day life.  The violent outbursts did not occur daily but from time to time. Plaintiff testified that he was unable to mentally take the stress of his life.  He had been diagnosed with and treated for depression.  Plaintiff stated that he constantly thought about the worst that could happen, and when something positive occurred, he waited for it to disappear. Plaintiff had attempted suicide in the past, and he testified to taking 45 Xanax pills in 2010, resulting in a 3-day stay in the hospital psychiatric unit.  (Tr. 35-37)

Plaintiff stated that he took Xanax and Zyprexa for his mental impairments.  He also testified that his doctor planned to try a new medication for ADHD.  The medications reduced

his depression and paranoia but did not eliminate the symptoms. He previously took Thorazine, but his new doctor took him off the medication to clear Plaintiff's mind and determine which medications would work best. Plaintiff had problems going out into public because he felt people were staring at him or someone was behind him. He also felt that people were talking about him. If he went somewhere, he tried to get in and out as quickly as possible. Plaintiff testified that he did not leave his house because he had no friends or family, and he was more comfortable in his house. Plaintiff's wife worked from midnight until 8:00 a.m. His son attended daycare because DHS would not allow Plaintiff to be alone with him. Plaintiff was able to care for his son in the evenings but had problems picking him up due to right shoulder pain. His son weighed 21 pounds, and Plaintiff testified that he held his son on the left side. Plaintiff's wife paid all the bills, and Plaintiff did not interact with any people around the apartment complex. He stated that he was completely dependent on his wife. (Tr. 37-41)

Plaintiff drove once or twice a week to the daycare, which was four miles round trip. He was stressed and anxious when driving. In addition, Plaintiff mentioned a recent episode where he had to leave the mall immediately because he was so uncomfortable. During these "panic attacks," his heart would race, he would sweat, his mouth would get very dry, and his mind would spin. Plaintiff stated that he generally had difficulty concentrating. He did not read books and learned by watching and listening. He had problems sleeping and never slept through the night. The death of his parents was the worst thing he had experienced. (Tr. 41-43)

Plaintiff previously took Seroquel and Thorazine but stated that the medication made him feel especially detached. He continued to see things and hear voices that were not there about two to three times a week. Recently, his wife walked into the room, and he thought she was his

mother. He also heard his mother's voice telling him to come home to her. Plaintiff attributed this to his failure to properly grieve his mother's death in 2009. Plaintiff did leave the apartment to take out the trash in the evenings. He spoke to the daycare workers when he picked up his son, but Plaintiff testified that he basically only talked to his wife. Plaintiff used to enjoy working on cars, but he had lost interest in all of his hobbies. (Tr. 43-46)

The ALJ also questioned Plaintiff regarding his alleged impairments. Plaintiff stated that he had an x-ray of his shoulder but not an MRI because Medicaid would not pay for that test. He was going to a pain management center for pain pills and injections. The injection helped but not instantly. Although he experienced sharp pains in his shoulder, Plaintiff testified that he wasn't limited by his shoulder. His mental state was his main problem. Plaintiff further stated that he had a medical marijuana license for anxiety when he lived in Denver, Colorado. He stopped using marijuana when he moved out of Colorado because it was illegal outside the State of Colorado. Plaintiff had just started counseling. He found a therapist that he liked and had one session with her. He planned to attend sessions once a week. Plaintiff testified that he dumped all of his medication on more than one occasion but never lost his medication. After his overdose, he only received weekly prescriptions. (Tr. 46-51)

Plaintiff's wife, Jenny Wiley, also testified at the hearing. She stated that her husband was unable to grasp the smallest details of a normal conversation. He had not been able to work and could not understand the concept of providing food for himself. She had to remind him to eat dinner. In addition, she paid all the bills because he was unable to do so because he could nto handle stress. Ms. Wiley also stated that Plaintiff had no friends other than her. Plaintiff never when out during the day, and he could not drive without help with directions. Ms. Wiley

considered her husband to be depressed because he did not sleep much, and he would see and hear his mother. He gained weight and just seemed depressed. He had no life or interests outside of her, and he was unable to make friends. He had angry outbursts more than once a day. For instance, when he could not get the car into gear, he would yell expletives in front of their son. In addition, he was unable to shop at stores he previously went to with his mother because he would freak out. Ms. Wiley stated that Plaintiff was scared of people judging him and that he would get looks from people because of his many tattoos. She believed Plaintiff also had obsessive compulsive disorder because he constantly rubbed his pants or her shirt, and he rearranged her closet. She opined that Plaintiff could not live on his own or take care of himself. A little bit of stress would set him over the edge. When questioned by the ALJ, Ms. Wiley stated that Plaintiff had amassed tattoos over half his life. He last worked in 2008. She did not think Plaintiff could take care of their son. (Tr. 51-57)

The ALJ then reexamined Plaintiff, who stated that he quit his last job when he learned his father had passed away. He then lived with his mother and cared for her until she passed away in August of 2009. Plaintiff had been on medication since he was 19 and in the Marine Corps, but something snapped in his mind when his mother died. (Tr. 58-60)

A Vocational Expert ("VE"), Roger Marcort, also testified at the hearing. The ALJ asked the VE to assume an individual who was only able to do simple, routine tasks. He could perform a low-stress job which required only occasional decision making and occasional changes in the work setting. He could have short-lived, superficial contact with the public, coworkers, or supervisors. Given those limitations, the individual could perform Plaintiff's past relevant work of lead former as noted by the Department of Labor and as actually performed. If the VE further

assumed a younger individual with a high school education and same past relevant work and residual functional capacity ("RFC"), the person could also perform other jobs such as lot attendant, sorter of agricultural produce, and cafeteria attendant. However, if the individual was off task 20 percent of the day or missed three or more days of work per month, he would be unable to perform any of the listed jobs. (Tr. 60-63)

Plaintiff's attorney also asked the VE to assume a person that was unable to work in any kind of close proximity to other people. If the person needed to be completely isolated from coworkers, the public, or supervisors, he could not perform any of the listed jobs. Furthermore, if an encounter with a supervisor would necessitate a 30 minute break, that would eliminate competitive employment. Finally, the ALJ asked if jobs existed for a person that had to work in complete isolation, in addition to the other limitations the ALJ set forth. The VE testified that no jobs were available for such a person. Plaintiff interjected that he had been physically able to work and that he couldn't work due to his mental state. (Tr. 63-65)

Plaintiff completed a Function Report – Adult on December 8, 2010. He described his daily activities as talking to his wife; cleaning the house; watching conspiracy shows; showering; crying; contemplating how terrible his mind is; worrying; looking at pictures of his deceased parents; and pacing back and forth. Plaintiff reported that he cared for his wife, who was 14 weeks pregnant at the time. He further stated that he was nervous and depressed, and his mind did not stop racing since his parents died. Plaintiff was able to care for his personal needs. However, he did not cook because he did not know how. He was able to clean, do laundry, wash dishes, dust, and vacuum for about 3 to 4 hours per day. He went outside for 1 to 2 hours at the most because he was afraid people were out to get him. In addition, he did not go out alone and

reported that he needed his wife for emotional support. Plaintiff shopped for food, cleaning products, and personal hygiene products ever 1 to 2 weeks for about 45 minutes at a time. Further, Plaintiff reported he could handle money. His hobbies included watching movies every day. He did not participate in social activities, and stated that he hated people. Plaintiff's condition affected his ability to remember, concentrate, understand, follow instructions, and get along with others. Further, Plaintiff could not pay attention for long; finish what he started; or follow written instructions. He could "kind of" follow spoken instructions. Plaintiff reported that he did not get along with people and was once fired after his boss demeaned him, and Plaintiff snapped. Additionally, Plaintiff was unable to handle stress or changes in routine. He described himself as very unstable, very aggressive, and very anxious. (Tr. 277-84)

### III. Medical Evidence

Plaintiff received mental health treatment prior to his alleged onset date of March 15, 2008 for complaints of anxiety, depression, obsessive-compulsive disorder (OCD), problems sleeping, and a racing mind. (Tr. 333-48, 389-90)

Beginning August 13, 2008, Plaintiff received psychiatric treatment from the Community Counseling Center. Plaintiff reported that he experienced a pounding heart, trembling, nervous tics, jumpiness, grinding teeth, inability to sit still, excessive sweating, frequent urination, migraine headaches, neck pain, low back pain, and nightmares. He also reported previous counseling and psychiatric treatment, as well as suicidal thoughts and prior attempts. The intake counselor assessed adjustment disorder with mixed anxiety and depressed mood; partner relational problems; problems with social network – mild; occupational problems – moderate;

economic problems – moderate; and a GAF of 50.[1]  The counselor further recommended that Plaintiff undergo individual counseling to alleviate anger and cope with changes in his life, as well as see a psychiatric nurse practitioner to be placed back on medications.  (Tr. 366-68)

On August 20, 2008, Plaintiff saw Dr. Durbin at the Community Counseling Center. Plaintiff reported being anxious, depressed, and angry, and he felt alone and powerless.  Dr. Durbin assessed Plaintiff's mood as anxious, depressed, discouraged, lonely, angry, and overwhelmed.  (Tr. 363-64) On August 27, 2008, Dr. Durbin encouraged Plaintiff to cut off contacts that end in his depression and begin a process toward social re-engagement.  (Tr. 362) On September 5, 2008, Dr. Durbin noted lots of positive strokes, as they discussed Plaintiff's skills and knowledge base as transferable to several new career options.  (Tr. 361) Plaintiff was greatly improved on September 19, 2008.  (Tr. 360)

Plaintiff saw Daniela Kantcheva, APRN, BC, APMHNP, a psychiatric nurse practitioner on September 23, 2008.  Plaintiff sought medication for his nerves.  Plaintiff was unemployed and attributed his inability to find a job to his tattoos.  Plaintiff was appropriately dressed with appropriate affect and good eye contact.  He denied suicidal/homicidal thoughts or hallucinations.  His thought process was logical and goal directed; his insight and judgment were fair to good; and his intelligence was average.  Nurse Kantcheva assessed bipolar disorder and depression, as well as a GAF of 50/55.  She prescribed Symbyax and Trazadone.  (Tr. 357-58)

On October 7, 2008, Plaintiff reported to Dr. Durbin that his medications were not

_____

[1]  A GAF of 41-50 demonstrates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

working.  Dr. Durbin discontinued Symbyax and prescribed Seroquel and Vistaril. (Tr. 355)  On

October 15, 2008, Dr. Durbin noted that Plaintiff was doing much better, as he was ready to

move on from his divorce.  (Tr. 352)  However, on November 5, 2008, Plaintiff was very

anxious because his ex-wife was getting remarried.  Plaintiff reported being agitated and upset,

with some homicidal/suicidal thoughts.  Plaintiff again expressed that he medications were not

working, and he sought a prescription for Xanax, which worked previously.  (Tr. 351)

He was evaluated by Dr. Kishore Khot performed a psychiatric evaluation on November

5, 2008, and diagnosed panic disorder without agoraphobia; family issues [severe]; social issues

[severe]; and a GAF of 60.[2]  Plaintiff reported that he was able to work but was presently

unemployed.  Dr. Khot restarted Xanax for panic attacks, prescribed Ambien for insomnia; and

recommended that Plaintiff continue counseling. (Tr. 350, 369-70)  On November 17, 2008,

Plaintiff was doing better and was calmer such that he could gradually decrease his medication

dosage. (Tr. 390)

A non-examining physician, James Spence, Ph.D., completed a Mental Residual

Functional Capacity Assessment and a Psychiatric Review Technique on January 13, 2009. He

opined that Plaintiff retained the capacity to complete at least simple, repetitive tasks on a

sustained basis.  Further, Dr. Spence stated that Plaintiff would work most effectively in a low-

demand environment that required only minimal contact with others.  Dr. Spence found

moderate limitations in Plaintiff's ability to understand and remember detailed instructions; carry

out detailed instructions; maintain attention and concentration for extended periods; work in

_____

[2]   A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in
social, occupational, or school functioning." <u>DSM-IV-TR</u> 34.

coordination with or proximity to others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 371-73)

During a counseling session on March 16, 2009, Plaintiff reported that he was doing well and looking for a job. However, on August 31, 2009, the doctor noted that Plaintiff's mother had died. Plaintiff expressed anger with his mother's doctors and asked to be knocked out before he did something he would regret. On September 14, 2009, Plaintiff was overall better. (Tr. 391)

Plaintiff returned to Dr. Collins on February 8, 2010. He was still grieving but reported that he would not kill himself because he cared about his wife. Dr. Collins recommended that he restart Xanax and Zyprexa and seek treatment for his grief. (Tr. 393) On March 9, 2010, Plaintiff reported to Dr. Collins that the Xanax kept him from acting on his anger, but that Zyprexa didn't help. Plaintiff was still angry about his mother's death, and Dr. Collins recommended anger management therapy. (Tr. 394) Plaintiff was doing better on April 5, 2010. He reported sleeping 9 hours a night. The Zyprexa helped with anger, and he was doing better with the loss of his mother. (Tr. 395)

On June 11, 2010, Plaintiff was admitted to Southeast Missouri Hospital due to a Xanax overdose and drug abuse. Dr. Khot evaluated Plaintiff, noting that Plaintiff had a long history of anxiety, depression, and mood swings that had been worsening since his mother's death. Dr. Khot also noted that Plaintiff had become increasingly depressed, angry and irritable, which was complicated by the use of OxyContin, opioid pain pills, and marijuana. Plaintiff's wife indicated that Plaintiff also took more Xanax than what was prescribed to get high. Plaintiff admitted to wrongdoing and expressed a willingness to get help. Dr. Khot assessed bipolar I disorder, most

recent depressed; polysubstance abuse of Xanax, marijuana, and opioid pills; chronic pain; family issues, social issues which were severe; and a GAF of about 40.[3] Dr. Khot planned to start Plaintiff on Prozac and Seroquel. Plaintiff was stabilized on medication and discharged on June 14, 2010 with a GAF of 55. (Tr. 399, 408-410)

Plaintiff returned to Dr. Khot on November 18, 2010 for treatment of his severe panic disorder. He reported that he was looking for a low-stress job but was having a lot of panic attacks. Plaintiff indicated that only Xanax helped, which he resumed taking after seeing Dr. Collins in Denver. Dr. Khot prescribed Xanax but had Plaintiff sign a controlled substance agreement. On examination, Plaintiff's affect and mood were anxious. He had no suicidal or homicidal ideation, no overt paranoia, and no current auditory hallucinations. Dr. Khot assessed panic disorder; family/social issues [severe]; and a GAF of 55/60. (Tr. 415)

On January 6, 2011, Dr. Spence completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment. He assessed Affective Disorders, Anxiety-Related Disorders, and Substance Addiction Disorders. Dr. Spence found moderate degrees of limitation with regard to difficulties in maintaining social function and difficulties in maintaining concentration, persistence, or pace. Plaintiff had no restriction of activities of daily living or repeated episodes of decompensation, each of extended duration. Dr. Spence opined that the totality of the evidence supported Plaintiff's allegations, but his mental impairments with medications did not preclude work in a low-demand environment away from the public. (Tr.

---

[3] A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . .)." DSM-IV-TR 34.

11

417-28)

In the Mental Residual Functional Capacity Assessment, Dr. Spence found that Plaintiff was moderately limited in his ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 429-30)

Plaintiff returned to Dr. Khot on January 27, 2011 and reported experiencing fears and paranoia. In addition, Plaintiff stated that he occasionally heard a voice telling him he was a bad person. Xanax helped with the anxiety, but not with the fears. Seroquel helped as well, but Plaintiff, who was uninsured, could not afford the medication. Mental status exam revealed an anxious affect and mood, with no suicidal or homicidal ideation. Dr. Khot assessed panic disorder and psychotic disorder, not otherwise specified. He prescribed Navane and continued Plaintiff's Xanax prescription. (Tr. 452)

But on March 9, 2011, Plaintiff wanted to switch psychiatrists because he felt intimidated by Dr. Khot. He also stated that the Navane made him feel worse and that only Seroquel helped him. Plaintiff decided to stay with Dr. Khot, who noted that Plaintiff still had some anxiety bordering on paranoia. (Tr. 451) On May 9, 2011, Plaintiff reported that the Seroquel made him feel calmer and not as angry, and the Xanax helped his anxiety. He reported no side effects.

Plaintiff's affect and mood were cheerful.  (Tr. 447)

On May 20, 2011, Dr. Khot completed a Medical Source Statement – Mental.  He checked that Plaintiff was either markedly limited or extremely limited in understanding and memory, sustained concentration and persistence, social interactions, and ability to adapt.  (Tr. 455-56)

On July 5, 2011, Wiley was again admitted to Southeast Missouri Hospital due to a Xanax and possible Seroquel overdose.  The police and EMS had been called to a gas station where Plaintiff could not figure out how to use the gas pump and was acting bizarre and disoriented.  The examining physician noted that Plaintiff had refilled a prescription for 90 Xanax on June 27, 2011 and that the pills were gone.  Plaintiff reported having post-traumatic stress disorder and polysubstance abuse.  Plaintiff was placed in ICU with a sitter due to his argumentative behavior.  While hospitalized, Plaintiff underwent a mental status exam.  John Thadeus Lake, M.D., noted that Plaintiff was covered head to toe with tattoos.  He had been agitated and swearing but was quite cooperative and friendly.  His mood was euthymic; affect stable; and flow of thought logical and goal directed.  Dr. Lake further noted that Plaintiff had no suicidal or homicidal ideation, and he displayed no psychotic behavior.  His insight and judgment were limited.  Dr. Lake diagnosed bipolar disorder, stable; impulse control disorder; history of polysubstance abuse; antisocial personality disorder; chronic back pain; moderate family stressors; and a GAF of 55.  Dr. Lake opined that Plaintiff was a low functioning individual with chronic psychiatric difficulties who was overwhelmed by stress.  Dr. Lake advised Plaintiff to take his medication as prescribed and follow up with Dr. Khot and Jason Ryan.  Plaintiff was discharged on July 6, 2011.  (Tr. 499-503)

Plaintiff saw Dr. Khot again on August 29, 2011, and reported continued mood swings and periods of irritability and impulsive behavior. He did not want to continue taking Seroquel, due to sedation, and thought that Xanax would help. Plaintiff denied abusing Xanax and indicated that it helped a lot with his anxiety. Dr. Khot diagnosed bipolar I disorder and panic disorder. He prescribed Xanax and a trial of Thorazine, and he discontinued Seroquel. (Tr. 470)

Plaintiff began seeing J. Patrick Bertroche, D.O., on April 12, 2012 for Bipolar Disorder and Attention Deficit Hyperactivity Disorder. In a letter dated April 13, 2012, Dr. Bertroche opined that Plaintiff's symptoms of anxiety and depression could make it difficult for him to follow instructions and maintain attention, concentration, and pace. In addition, these periods of anxiety and depression could also affect a person's ability to interact with supervisors and the public, as well as impair one's judgment. Dr. Betroche further opined that Plaintiff's ADHD could result in careless mistakes, difficulty keeping attention on tasks, inability to listen when spoken to directly, failure to follow through on instructions, trouble organizing activities, avoidance of tasks requiring a lot of mental effort, and forgetfulness and distractibility. Further, ADHD produced symptoms of hyperactivity and impulsiveness, which symptoms could also affect a person's ability to interact with supervisors or peers. (Tr. 476)

Dr. Betroche also completed a Medical Source Statement – Mental on May 23, 2012. He checked boxes indicating that Wiley was moderately and markedly limited in many areas of understanding and memory, sustained concentration and persistence, social interactions, and ability to adapt. (Tr. 479-80)

### IV.  The ALJ's Determination

In a decision dated July 12, 2012, the ALJ found that the Plaintiff med the insured status

requirements of the Social Security Act through December 31, 2013.  He had not engaged in substantial gainful activity since March 15, 2008, the alleged onset date.  The ALJ further found that Plaintiff had the severe impairments of affective disorder, anxiety disorder, and polysubstance abuse.  However, he did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ assessed Plaintiff's impairments under the paragraph B and paragraph C criteria and found that Plaintiff did not meet that criteria.  (Tr. 12-16)

After carefully considering the entire record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following nonexertional limitations: simple routine tasks with an SVP of 1 or 2; a low stress job, defined as occasional decision making and only occasional changes in the work setting; and short-lived, superficial contact with the public and co-workers.  Further, Plaintiff could perform his past relevant work as a lead foreman, as the work did not require performance of work related activities precluded by the Plaintiff's RFC.  In addition, Plaintiff could perfrom other work such as lot attendant, sorter of produce, and café attendant.  The ALJ thus concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from March 15, 2008, through the date of the decision.  (Tr. 16-22)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1).  The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period not less than 12 months."  20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process.  See 20 C.F.R. § 404.1520(b)-(f).  Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g).  "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'"  Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)).  The Court does not re-weigh the evidence or review the record de novo.  Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence.  Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints

regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s).  Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record.  Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995).  It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence.  Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[4] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 1354.

_____

[4]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

## VI.  Discussion

Plaintiff raises one argument in his Brief in Support of the Complaint.  Plaintiff argues that the ALJ erred by failing to provide a proper RFC based on substantial evidence as required by SSR 96-8p because the ALJ gave too much weight to the non-examining doctor while dismissing the treating physician's opinion, and the ALJ failed to properly consider Plaintiff's testimony. The Defendant responds the ALJ properly considered all of the evidence in the record as a whole, including Plaintiff's credibility and the medical evidence, to determine Plaintiff's RFC.  In addition, Defendant contends that the ALJ properly determined that Plaintiff was not disabled because he could perform his past relevant work and other jobs existing in significant numbers in the national economy.  The undersigned finds that substantial evidence supports the ALJ's determination of  Plaintiff's RFC such that the decision of the Commissioner should be affirmed.

With regard to Plaintiff's residual functional capacity, "a disability claimant has the burden to establish her RFC."  Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) (citation omitted).  The ALJ determines a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).  RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations.  20 C.F.R. § 416.945(a)(1).

Plaintiff argues that the ALJ erred by providing substantial weight to the non-examining state agency psychologist's opinion and little weight to both the treating physician, Dr. Khot, and

examining physician, Dr. Bertroche. Defendant, on the other hand, contends that the ALJ

properly discounted Dr. Khot's and Dr. Bertroche's medical source statements because they

contained no explanations for the opinions. Further, Defendant asserts that Dr. Spence, the state

agency psychologist, included narrative explanations supporting his questionnaire answers,

warranting greater weight.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to

substantial weight . . . provided the opinion is well-supported by medically acceptable clinical

and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence

in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted); see also

SSR 96-2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating

source's medical opinion unless the opinion is well-supported by medically acceptable clinical

and laboratory diagnostic techniques."). The ALJ need not give controlling weight to a treating

physician's opinion where the physician's treatment notes were inconsistent with the physician's

RFC assessment. Goetz v. Barnhart, 182 F. App'x 625, 626 (8th Cir. 2006). Further, "[i]t is

appropriate to give little weight to statements of opinion by a treating physician that consist of

nothing more than vague, conclusory statements." Swarnes v. Astrue, Civ. No. 08-5025-KES,

2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted); see also Wildman v. Astrue,

596 F.3d 959, 964 (8th Cir. 2010) (finding that the ALJ properly discounted a treating

physician's opinion where it consisted of checklist forms, cited no medical evidence, and

provided little to no elaboration).

Despite Dr. Khot's opinion that Plaintiff was either markedly or extremely limited in all

areas of mental functioning, his treatment notes did not reflect symptoms of such severity that

would preclude Plaintiff from performing any work. For instance, despite a Xanax overdose and a GAF of 40 when admitted to the hospital, Dr. Khot assessed a GAF of 55 upon discharge and noted that Plaintiff was stabilized on medication. In addition, Dr. Khot noted that the use of opioid pain medication and marijuana, as well as the overuse of Xanax, complicated Plaintiff's mental impairments. (Tr. 399, 408) Further, on November 18, 2010, Dr. Khot noted that Plaintiff's affect and mood were anxious. However, Plaintiff reported that Xanax helped and that he was looking for a low-stress job. Dr. Khot assessed a GAF of 55/60, indicating moderate symptoms. (Tr. 415) On May 9, 2011, Plaintiff's affect and mood were cheerful. (Tr. 447) Despite Dr. Khot's treatment notes indicating improvement with medication, Dr. Khot completed a medical source statement on May 20, 2011 indicating marked and extreme limitations. (Tr. 455-56) The ALJ gave the questionnaire little weight, noting that the opinion was conclusory, failed to provide any explanation, and was unsupported by treatment records. (Tr. 19)

As stated above, the ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. Goetz, 182 F. App'x at 626. Additionally, the ALJ may properly give little weight to an opinion that consists of vague, conclusory statements or is merely a checklist with no elaboration. Swarnes, 2009 WL 454930, at *11; Wildman 596 F.3d at 964. As Dr. Khot's medical source statement contained limitations far more severe than indicated in the treatment record and failed to include any medical evidence or explanation, the ALJ properly gave the opinion little weight.

Likewise, the ALJ properly gave little weight to the opinion of Dr. Bertroche, who only

treated Plaintiff once before completing a medical source statement indicating moderate and marked limitations. The record contains no treatment notes but merely a letter noting attention and social interaction problems stemming from ADHD. (Tr. 476) The ALJ also gave Dr. Bertroche's conclusions little weight, as the letter set forth symptoms of ADHD but did not demonstrate how the alleged impairments affected Plaintiff specifically. (Tr. 20) Further, the ALJ noted that the preprinted form was vague and based on short treatment history. (Tr. 20) Similar to the opinion of Dr. Khot, the ALJ properly gave little weight to Dr. Bertroche's letter and medical source statement, as the opinions were conclusory, were not supported by medical evidence or explanation, and merely consisted of checked boxes. In addition, the fact that Dr. Bertroche saw Plaintiff on only one occasion entitled the ALJ to give the opinion little weight. "Generally, the longer a treating source has treated [claimant] and the more times [claimant] has been seen by a treating source, the more weight we will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i). Therefore, the Court finds that the ALJ gave proper weight to the opinions of Drs. Khot and Bertroche.

Plaintiff also argues that the ALJ erred in giving substantial weight to the non-examining psychologist's opinion. However, the record demonstrates that Dr. Spence based his opinions on the medical evidence and included narrative explanations of how the evidence supported his conclusions. (Tr. 373, 427) Dr. Spence assessed some moderate limitations in understanding and memory; sustained concentration and persistence; and social interaction.[5] (Tr. 371-72, 429-

---

[5] Plaintiff argues that Dr. Spence's opinions were inconsistent and that the ALJ erroneously failed to address the differences. While the two assessments are not identical, the differences are minor, and both opinions demonstrate Plaintiff's ability to work in a low-demand environment with minimal contact with others. (Tr. 373, 427)

30)  However, Dr. Spence found that Plaintiff retained the ability to complete simple, repetitive

tasks in a low-demand environment requiring only minimal contact with others.  (Tr. 373, 427)

Dr. Spence supported these opinions with evidence demonstrating improvement with counseling

and medication, as well as an ability to care for himself and perform household chores.  (Tr. 373,

427)

The undersigned notes that "[t]he opinions of non-treating practitioners who have

attempted to evaluate the claimant without examination do not normally constitute substantial

evidence on the record as a whole."  Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003).

However, an ALJ may afford more weight to a non-examining doctor's opinion where the

opinion is consistent with the record.  Johnson v. Colvin, No. 2:13CV55 DDN, 2014 WL

2804350, at *19 (E.D. Mo. June 20, 2014).  Here, Dr. Spence's assessment is consistent with the

treatment notes contained in the record, which indicated some problems with concentration and

social interaction, but also showed moderate limitations, improvement with medication, and a

desire to look for low-stress work.  (Tr. 17-19, 360-61, 370, 391, 395, 399, 415, 447, 470, 476,

499-500)  Therefore, the Court finds that the ALJ did not err in giving substantial weight to Dr.

Spence in determining Plaintiff's RFC.

The Plaintiff argues, however, that the ALJ also erred in assessing Plaintiff's credibility.

Defendant, on the other hand, asserts that the ALJ properly discounted Plaintiff's subjective

complaints.  The undersigned agrees with the Defendant.

Here, the ALJ thoroughly considered Plaintiff's testimony and discussed Plaintiff's lack

of credibility in light of the medical evidence indicating less severe symptoms than alleged;

sporadic medical treatment; Plaintiff's noncompliance with recommended treatment; reduced

symptomatology when compliant with medication; Plaintiff's daily activities; and the fact that Plaintiff actively sought employment while allegedly disabled.  (Tr. 18-19)  For instance, as stated above, Plaintiff's doctors indicated moderate symptoms and noted that Plaintiff's symptoms improved with medication.  "[I]mpairments that are controllable by medication do not support a finding of disability."  Collins ex rel. Williams v. Barnhart, 335 F.3d 726, 729-30 (8th Cir. 2003).  The ALJ also noted that Plaintiff only sought mental health counseling sporadically. (Tr. 19)  Indeed, the treatment records indicate that Plaintiff did not consistently seek mental health treatment and primarily requested medication refills.  (Tr. 351, 369-70, 395, 415, 447, 470)  "A lack of regular treatment for an alleged disabling condition detracts from a claimant's credibility."  Albert v. Colvin, No. 1:13CV125 NCC, 2014 WL 2106709, at *7 (E.D. Mo. May 19, 2014).  Further, Plaintiff stated on more than one occasion that he was actively seeking work but had been unsuccessful.  (Tr. 361, 370, 391, 415)  Continuing to search for a job during the relevant time period of alleged disability undermines a claimant's assertion that he was unable to work.  Melton v. Apfel, 181 F.3d 939, 942 (8th Cir. 1999).

In addition, the record shows that Plaintiff was quite active on a daily basis, which demonstrated inconsistencies between these activities and an alleged inability to perform any type of work.  The record demonstrates that Plaintiff reported cleaning the house, doing laundry, driving, shopping, watching movies, handling his personal care, dealing with finances, and caring for his son in the evening.  (Tr. 15, 19, 40-41, 277-84)  The ALJ determined that Plaintiff could perform a wide variety of activities that were inconsistent with this allegations of disability.  (Tr. 19)  An ability to engage in a number of daily activities detracts from Plaintiff's credibility.  See, e.g., Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (stating that plaintiff

was able to vacuum wash dishes, do laundry, cook, shop, drive, and walk were inconsistent with her subjective complaints and diminished her credibility); <u>Roberson v. Astrue</u>, 481 F.3d 1020, 1025 (8th Cir. 2007) (affirming the ALJ's credibility analysis where the plaintiff took care of her child, drove, fixed simple meals, performed housework, shopped, and handled money); <u>Slack v. Astrue</u>, No. 4:07CV1655 RWS, 2009 WL 723832, at *14 (E.D. Mo. March 17, 2009) (finding plaintiff's ability to hunt for small game, prepare meals, and do some yard work was inconsistent with allegations that he needed to spend most of the day resting).

In short, the ALJ properly set forth inconsistencies in the record which detracted from Plaintiff's credibility. The ALJ then formulated an RFC which accounted for Plaintiff's credible limitations based on the record as a whole, such as simple routine tasks; a low-stress job with only occasional decision-making and occasional changes in the work setting; and short, superficial contact with the public and co-workers. (Tr. 16) Thus, substantial evidence supports the ALJ's RFC determination and denial of disability benefits. <u>See</u> <u>Moore v. Astrue</u>, 623 F.3d 599, 603-04 (8th Cir. 2010) (affirming the ALJ's determination that the plaintiff retained the RFC to interact with others infrequently; adapt to infrequent work changes; and perform simple, routine tasks). The decision of the Commissioner should therefore be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  <u>See Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this <u>14th</u> day of August, 2014.